## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

PAMELA GRAESSLIN,

|                          |                              |
|--------------------------|------------------------------|
|              Plaintiff,  |         OPINION & ORDER       |
|     v.                   |                              |
|                          |         14-cv-359-wmc         |
| DULUTH TRADING COMPANY,  |                              |
|              Defendant.   |                              |

Plaintiff Pamela Graesslin was diagnosed with cancer in June of 2012. Later that same month, Graesslin told her employer, defendant Duluth Trading Company ("DTC"), of her condition. About a year later, following multiple surgeries, Graesslin was abruptly terminated as part of a purported "restructuring" of the company, although only her position appeared to have changed and she alone lost her job. On May 19, 2014, Graesslin brought this lawsuit under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, as amended by the Americans with Disabilities Act Amendments of 2008, alleging that she was terminated because of her cancer.[1]

In its motion for summary judgment (dkt. #10), DTC admits that Graesslin was a qualified individual with a disability but contends that she was terminated for legitimate, non-discriminatory reasons. In this opinion, the court outlines the genuine disputes of material fact that remain for trial with respect to whether Graesslin's cancer was a but-for cause of her termination, including steps apparently taken by her immediate supervisor to reduce Graesslin's involvement in important decisions and meetings shortly after her cancer

---

[1] Graesslin filed a charge of discrimination against DTC on November 8, 2013. On or about March 11, 2014, the Equal Employment Opportunity Commission issued her a Right-to-Sue letter. (Compl. (dkt. #1) ¶ 5.)

was disclosed and (2) recruit her replacement within five months of the disclosure.  Because the resolution of these factual disputes in Graesslin's favor may be enough to establish the requisite causal link between her cancer and her termination, the court will deny DTC's motion.

## UNDISPUTED FACTS

### I.  Preliminary Matter

DTC filed its proposed findings of fact as required by this court's procedures to be followed on motions for summary judgment.  (Dkt. #12.)  Graesslin responded to those proposed findings (dkt. #19) and submitted her own statement of additional facts (dkt. ##20, 21), although her responses leave something to be desired, as they cite extensively to her own statement of facts, rather than clearly identifying each asserted dispute and supporting it with admissible evidence.  Far more egregiously, DTC then failed to respond in *any* way to Graesslin's statement of additional facts, even though DTC was expressly required to file its response to those facts at the same time as its reply pursuant to the court's summary judgment procedures. Moreover, this failure leads (if not compels) the court to conclude that these additional facts are undisputed.  (*See* Prelim. Pretrial Conference Order (dkt. #7) ECF 13-15.)

The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000).  Accordingly, the court will consider Graesslin's additional proposed facts to be undisputed so long as they are proper factual statements supported by admissible evidence and so long as they do not

directly conflict with DTC's own proposed findings of fact.  With that in mind, the court

finds the following facts to be material and undisputed except as noted.

## II.  The Parties

Defendant, The Duluth Trading Company, or "DTC," is a seller of rugged and

durable work clothes at its retail stores and outlet stores, as well as online.  Mark DeOrio is

DTC's Chief Financial Officer and Senior Vice President of Operations.

Plaintiff, Pamela Graesslin, is a fifty-nine-year-old resident of Barneveld, Wisconsin.

She  has  over  thirty  years  of  management  experience  in  the  manufacturing,

telecommunications  and  retail  industries,  including  some  experience  at  another  clothing

retailer, Lands' End.

## III.  Graesslin's Early Employment

In December of 2007, Graesslin was offered and accepted the position of Call Center

Manager at DTC, with a start date of January 2, 2008.  In that position, Graesslin was

responsible for managing the call center located in Belleville, Wisconsin, including:  (a)

staffing, scheduling and supervising all call center employees; (b) budgeting call center

activities; and (c) ensuring the effectiveness of customer interactions with the call center.

Originally, Graesslin reported to Daniel Moeller, then the Director of Operations.

As Call Center Manager, Graesslin also oversaw the growth of the Call Center from

about twenty or thirty employees to more than seventy employees and directed a three-

person management team consisting of Kate Carpenter, Faith Feldman and Nancy Vodak.

Additionally, Graesslin avers that she led efforts to improve DTC's customer experience and

developed new metrics to track various key performance indicators for individuals and the

3

Call Center as a whole.  By 2010 or 2011, DTC had renamed the "Call Center" to the "Contact Center" to reflect its modernized and expanded focus on customer communication and satisfaction.[2]

On February 3, 2012, after Moeller left DTC, DeOrio took over as Graesslin's immediate supervisor and began to have one-on-one meetings with her to discuss ideas for improving DTC's "customer experience" and moving from a quantitative to a qualitative approach to customer feedback.  DeOrio told Graesslin that he agreed with and would support her efforts.  As a result, Graesslin was able to implement numerous changes and initiatives.

For example, Graesslin and her team planned to implement an "After Call Survey," which would allow them to better track and manage immediate customer feedback about product quality, pricing, shipping, agent interaction, ease of website use and related issues. Graesslin also directed the setup of focus groups that used agents to survey customers about problems with ordering online and provided that information to the web team. Additionally, Graesslin oversaw service from, and DTC's relationship with, a third-party call center located in Atlanta, Georgia, and she worked with DTC's social media consultant to better manage and assess customer internet responses.

In March of 2012, DeOrio provided Graesslin with a 2011 performance review, which was positive overall and stated in part:  "Pam, there are many exciting opportunities for Customer Care in 2012 and beyond.  I look forward to pursuing those with you."  In April 2012, DeOrio also asked Graesslin to participate in a two-day strategic planning/team-

---

[2] Given the lack of any clear distinction in the current record between the pre-2010 "Call Center" and the later named "Contact Center," the court refers to this division of DTC simply as the "call center."

building meeting with the Senior Management team. None of the participants expressed any concerns about Graesslin, her qualifications or her capabilities. In fact, before her cancer diagnosis, *no* member of DTC's management, including DeOrio, had ever expressed any concerns or doubts to Graesslin about her qualifications, capabilities or skills related to customer service, customer experience or her ability to direct or participate in that function.

### IV. Graesslin's Cancer Diagnosis and First Surgery

On Thursday, June 21, 2012, a cancerous tumor was detected in Graesslin's small intestine, and she was admitted to the hospital immediately for tests. The following Monday, June 25, she returned to work and informed DeOrio and Helen Linder, the Director of Human Resources, that she had a tumor that would require at least one surgery, as well as a spot on her liver. Although her prognosis was uncertain, Graesslin told DeOrio and Linder that she was fully dedicated to DTC and intended to continue working there while missing as little work as possible.

After informing DeOrio and Linder of her cancer, Graesslin was never again invited to attend meetings with the Senior Management team, and her inquiries to Linder and DeOrio about attending future meetings garnered no response. Between late June and September of 2012, Graesslin took approved, intermittent FMLA time for cancer-related medical appointments. Graesslin claims she kept DeOrio fully apprised of her situation, although DeOrio has averred that Graesslin shared little about her condition and that he "respected her privacy." (*Compare* Def.'s PFOF (dkt. #12) ¶¶ 16-18, *with* Pl.'s PFOF (dkt. #20) ¶¶ 29-30.) At the time Graesslin worked at DTC, DeOrio was not aware that cancer was a covered disability under the ADA. (Mark DeOrio Dep. (dkt. #16) 148:17-20.)

While Linder had never received training or instruction on anti-discrimination issues, she knew cancer was a protected condition.

On September 6, Graesslin underwent surgery to remove the tumor and over fourteen inches of her small intestine, portions of the right side of her colon, and her appendix, all of which affected her digestive and bowel functions.  During her recovery, Graesslin continued to work with her staff via e-mail and telephone, and although her surgeon had originally envisioned her missing six weeks, she also managed to return to work after four weeks, on October 8.  Graesslin then worked for a week before taking a pre-planned vacation with her husband.  She had lost between twenty and twenty-five pounds.

In prior years, business unit leaders, including Graesslin, had presented their plans for handling "peak season" activities to DTC's Executive Team.  When Graesslin inquired about her upcoming presentations for late fall 2012 and spring 2013, however, DeOrio indicated that *he* would be presenting on behalf of the Contact Center.  DeOrio never provided Graesslin with any of the follow-up information she requested about those presentations.

## V. Changes in the Retail World

### A. Omni-Channel Retailing

DTC's business, and the retail world more generally, have evolved quickly and dramatically since DTC opened its first brick-and-mortar retail store in 2010.  Retail customers are no longer satisfied making a binary choice between a brick-and-mortar store experience and an online experience.  Rather, they increasingly combine a number of channels to complete their shopping experience in a way they find most satisfying.  Customers that combine a variety of channels in their shopping, buying, returning and

exchanging behaviors are known as "Omni-channel customers." Retailers who strive to meet or exceed their customers' Omni-channel expectations are known as "Omni-channel retailers." The rewards for successfully executing an Omni-channel retail platform are substantial.  For instance, industry studies indicate that Omni-channel retail customers are more loyal and tend to spend more than other customers.

Because of the rise of Omni-channel retailing and customers, the call center's role in DTC's business has changed.  Online customers now represent more than 70% of total company sales and are increasingly able to navigate websites without assistance.  As a result, they have come to expect a "self-service" experience that requires no telephone interactions. While DTC continues to accept telephone orders and e-mails from customers, this means that the customer contacts through the call center are growing at a significantly slower pace than the company's overall sales.  For instance, total call center contacts for calendar year 2014 were expected to grow by only 15% over 2013, while the company's sales were expected to grow by more than 30% over the same period.  Likewise, total call center contacts are expected to grow by approximately 19% in calendar year 2015, as compared to 2014, while the company's sales are expected to grow by approximately 35% during that period.  This disparity in growth rates has existed for the past few years and is expected to continue in the future.[3]

Likewise, the role of printed catalogues continues to decrease year after year, both for DTC and other retailers generally.  For calendar year 2015, catalogue circulation is

---

[3] The record leaves much to be desired in assessing the real significance, if any, of disparity in growth between traditional contacts and sales.  As an example only, because there is no disclosure of how it compares to DTC's, or for that matter, the industry's historic growth rates, it is conceivable the growth in sales has regularly exceeded the growth in customer contacts for no other reason than that existing customers have increased unassisted purchases, at least in terms of dollars spent.

budgeted to increase by 14% and catalogue spending by 16%, while sales are expected to grow by 35%.[4]

Not surprisingly, given these apparent changes in the retail market, and in light of the rewards associated with a successful Omni-channel retail platform, DTC determined several years ago that to continue to thrive, it would need to become excellent in all aspects of Omni-channel retailing.  DTC recognized that this would require it to create and deliver a consistently outstanding customer experience wherever a customer elected to do business with it and instituted "aggressive" plans to maximize the customer relationship across every channel, including catalogue, website and retail sales.

**B.  Creation of the Director of Customer Experience Position**

To accomplish its plans, DTC claims it needed one highly-capable person, the "Director of Customer Experience," responsible for *all* aspects of the customer experience.[5] DTC envisioned that this person would be responsible for maximizing the customer experience across all channels; managing the interrelationship of all channels; and leading the e-commerce team in improving the online customer experience.  Thus, the Director of Customer Experience position would subsume all the duties of the traditional Call Center Manager position, in addition to taking on additional duties deemed crucial to DTC's goal of furthering its standing as an Omni-channel retailer.

---

[4] Again, without more historic data, it is difficult to interpret or extrapolate how meaningful this trend may or may not be in terms of the importance of catalogues going forward.  For example only, if increasingly unimportant, why are catalogue expenses increasing at all?

[5] There was no formal "Director of Customer Experience" position in existence at DTC during Graesslin's employment.

DTC maintains that in its assessment, Graesslin was not qualified to take on a number of the duties assigned to this new position.  The details of those duties appear in DeOrio's affidavit and include designing and implementing a Home Agent program, working with outside third-party providers to implement customer experience procedures, and directing staff handling all aspects of customer experience.  (Mark DeOrio Aff. (dkt. #13) ¶¶ 53(a)-(i).)  According to DTC, none of the new duties were previously part of Graesslin's responsibilities as Call Center Manager: her duties were less complex, and she was primarily responsible for managing the customer service telephone operatives in the Belleville office.  Graesslin disputes that characterization, arguing that she was already unofficially performing many of the ostensibly "new" duties, including through her work with DTC's Director of e-Commerce in connection with testing of e-commerce site updates and providing customer feedback.

DTC decided to move forward with the Omni-channel implementation plan in April of 2013.  As part of that implementation, DTC decided to fill the new Director position with Joan Conlin.  Conlin is highly qualified and a well-respected individual in the industry.  Before joining DTC, Conlin had worked roughly thirty years for Lands' End, a major online and telephone clothing distributor.  She served as Lands' End Vice President of Customer Sales & Service from 2005 to 2013.  She retired in 2013.

The parties dispute *when* employment discussions began between DTC and Conlin.  Conlin either contacted DTC's Chief Operating Officer and President, Stephanie Pugliese, in early 2013 to express her interest in working for DTC should a position become available, or Pugliese approached *Conlin* about possible employment in December of 2012.  Regardless, after several meetings with management to discuss Conlin's experience and

vision, including a meeting in March of 2013 at Eno Vino restaurant in Middleton and two meetings at restaurants in April of 2013, DTC decided to hire her on May 17, 2013. No one else interviewed for the job, nor were any other individuals offered the position.

## VI.  Graesslin's Performance Review and FMLA Leave

On or about March 9, 2013, DeOrio gave Graesslin her 2012 performance review. For the first time since Graesslin started work at DTC, the performance review contained criticism about Graesslin's "poor morale" and "lack of sense of urgency."[6]  DeOrio had never previously raised any of these concerns with Graesslin, either at any of his weekly visits to the Contact Center or during any of their one-on-one meetings.  The 2012 performance review also failed to mention any of Graesslin's customer experience initiatives or accomplishments.

On March 27, Graesslin was required to undergo a liver ablation procedure, for which she had to miss five days of work without pay.  Graesslin requested FMLA leave from March 27 through April 2, 2013, for what DeOrio understood to be necessary surgery related to her cancer diagnosis.  The company readily granted that leave.  Upon her return to work on April 3, Graesslin provided the human resources department with a fitness for duty certification, in which her treating physician asked that she be allowed to fulfill her

---

[6] Graesslin characterizes this criticism as "unfair and inaccurate (if not completely false)," but the only record support is her own affidavit.  A plaintiff's own evaluation of her work cannot be imputed to her employer and, without supporting facts, is not "evidence" sufficient to combat summary judgment.  *See Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011).  Likewise, Graesslin attributes the criticism to her having missed work in the fall of 2012, but she offers no evidence to support any such causal link.  *See Jordan v. Summers*, 205 F.3d 337, 343-44 (7th Cir. 2000) ("But without supporting facts or explanatory details, this 'perception' [of discriminatory 'grooming'] is merely speculation regarding Customs's motives and cannot defeat summary judgment.").  In any event, it has little bearing on the motion for summary judgment, since the parties agree that this negative performance review was not the basis for Graesslin's eventual termination.

work day at her discretion of four to eight hours per day between April 3 and 5, due to post-ablation syndrome.   That same day, the human resources department acknowledged Graesslin's fitness for duty and restrictions by e-mail and granted them without hesitation.

Graesslin ended up taking partial FMLA leave days on April 3, 4 and 5.   The following Monday, April 8, she returned to work without restriction.   She did not request any additional FMLA leave after April 8.

Graesslin avers that around this same time, DeOrio became increasingly evasive when she tried to engage him in discussions, and that he began visiting the Contact Center at irregular times, although she provides no additional specifics.   DeOrio has averred that as far as he knew, Graesslin was "perfectly healthy" after she returned from surgery.   (Def.'s PFOF (dkt. #12) ¶ 19.)   It is undisputed, however, that Graesslin never told him any such thing.   In fact, Graesslin avers she kept him informed about her condition and told him that her cancer had actually metastasized to her liver.   (Pl.'s PFOF (dkt. #20) ¶¶ 29-30.)

**VII.   Graesslin's Termination**

Once Conlin accepted DTC's offer, DTC was in a position to eliminate the Call Center Manager position.   Due to inconsistencies in defendants' evidentiary materials, it is unclear: (1) when the decision was made to terminate Graesslin; and (2) who actually made that decision.   DTC's answers to Graesslin's first set of interrogatories indicate that DeOrio, Linder and Pugliese held a conference on June 10, 2013, at which time they made the decision to terminate Graesslin.   In contrast, DeOrio testified at his deposition that he recommended termination "sometime" in the month after May 17, then he got the approval of Pugliese and Steve Schlecht.   DeOrio also testified that Linder and he consulted with

corporation counsel before terminating Graesslin (DeOrio Dep. (dkt. #16) 149:9-22), but Linder denied having taken part in any such conversation or knowing that it occurred (Helen M. Linder Dep. (dkt. #15) 43:21-25).

Graesslin had an exit interview on July 2, 2013, which was attended by DeOrio and Linder.[7]  Based on the facts of record, she does not seem to have had any warning of the impending termination before it occurred.

At the meeting, DeOrio informed Graesslin that her position was being eliminated. The parties dispute the substance of that conversation.  According to DTC, DeOrio informed Graesslin that the company was restructuring and hiring Conlin, and Graesslin acknowledged she knew of Conlin and was aware of her outstanding work and reputation. Graesslin, on the other hand, avers she was informed only that the company was going in a "new direction," even when she asked for more information, and she denies having discussed Conlin's reputation or qualifications with DeOrio.

After receiving the news, Graesslin asked if she could inform her direct reports that she was leaving.  DeOrio gave her permission to do so and accompanied her during those conversations.  The parties agree she remained relatively positive and professional.

Although DTC characterizes Graesslin's termination as a company "restructuring," it is undisputed that Graesslin was the only DTC employee to lose her position.  No reduction in force or downsizing took place.

---

[7] Graesslin disputes that this meeting was an "exit interview" and characterizes it as an abrupt, unexpected termination at a pre-scheduled meeting.

## VIII.   Conlin's Employment and Job Duties

Conlin began work at DTC on July 8, 2013.  She moved into Graesslin's former office in the Contact Center, took over the supervision of the same staff and Management Team, and assumed Graesslin's former job duties.  She also performs certain additional duties, including overseeing all customer experience in every channel.  Conlin claims that those additional duties account for 50% to 60% of her time at work.  (Joan Conlin Dep. (dkt. #14) 20:6-13.)  Her "self-assessment," in which she listed her accomplishments, contains few references to those additional duties, however, and Conlin agreed during her deposition that far less than half of her listed accomplishments pertain to these additional duties.  (*Id.* at 86:13-24.)


OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) ("no special summary judgment standard applies" to employment cases).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

13

Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'" *Celotex*, 477 U.S. at 323.

Graesslin's claim is for discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, as amended by the Americans with Disabilities Act Amendments of 2008 ("ADAAA").  Under the ADAAA, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees[.]"[8]  42 U.S.C. § 12112(a).  To prevail on an ADA discrimination claim, Graesslin must show: (1) she is disabled; (2) she is able to perform the essential functions of the job either with or without reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." *Majors*, 714 F.3d at 533.

Here, DTC does not dispute that Graesslin was disabled under the ADAAA or that she was qualified to perform the essential functions of her job.  (*See* Def.'s Br. (dkt. #11)

---

[8] The Seventh Circuit has not yet decided whether the ADAAA changed the traditional "but-for" standard of causation applicable to claims under the ADA.  *See Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 961 n.1 (7th Cir. 2010).  DTC argues that Graesslin must prove but-for causation. While Graesslin "neither agrees with nor concedes DTC's analysis" (Br. Opp'n (dkt. #24) 14), her brief also applies the but-for standard.  Because the court concludes the standard does not affect whether Graesslin survives summary judgment, it declines to express an opinion on this question at present.

10-11.)  Nor is this a "reasonable accommodation" case, as it is undisputed that Graesslin never requested any accommodations other than time off work, which she received.  Thus, the only question is whether Graesslin was terminated "because of" her disability -- that is, whether the employer "would have undertaken the same action in the absence of a disability."  *Walters v. Mayo Clinic Health Sys.-Eau Claire Hosp., Inc.*, 998 F. Supp. 2d 750, 767 (W.D. Wis. 2014).

Graesslin relies on the direct method of proof to establish the causation element of her discrimination claim.  Under the direct method, "a plaintiff can present either direct or circumstantial evidence to meet its burden."  *Dickerson*, 657 F.3d at 601.  "Direct evidence requires an admission by the decision maker that his or her actions were based upon the prohibited animus."  *Id.*  Since such admissions are uncommon, it is also permissible to rely entirely on "circumstantial evidence that allows a jury to infer intentional discrimination."  *Id.*  "The type of circumstantial evidence that a plaintiff may produce to survive summary judgment includes: (1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action."  *Id.* (citing *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 586-87 (7th Cir. 2011); *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011)).

To establish causation, Graesslin relies primarily on pretext or, as she puts it, the "sheer falsity" of DTC's proffered explanation that she was a casualty of restructuring and unqualified for the newly-created Director of Customer Experience position.  Graesslin contends that this explanation is nothing more than pretext for disability discrimination.

15

Pretext means "a dishonest explanation, a lie rather than an oddity or an error." *Bodenstab v. Cnty. of Cook*, 569 F.3d 651, 657 (7th Cir. 2009) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 642 (7th Cir. 2008)).  "Pretext can be shown by 'identif[ying] . . . weaknesses, implausibilities, inconsistencies, or contradictions' in an employer's asserted reason for taking an adverse employment action such 'that a reasonable person could find [it] unworthy of credence." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 487 (7th Cir. 2015) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 852-53 (7th Cir. 2012) (alterations in original)).

Here, Graesslin has presented sufficient circumstantial evidence for a reasonable jury to infer that DTC's reason for terminating her was pretextual.  To begin with, at least some of the duties that the new "Director of Customer Experience" was expected to take on were identical to those that Graesslin was already performing, apparently satisfactorily.  Although DTC contends that the job also encompassed substantial additional duties for which Graesslin was not qualified, there is evidence in the record to call into question the importance of those duties, as well as Graesslin's supposed lack of qualification to perform them.  For instance, Conlin admitted at her deposition that her own self-assessment makes little mention of those additional duties.  A reasonable jury could infer from this admission that the "additional duties" on which DTC relies play a smaller part in the Director of Customer Experience role than DTC contends.

Furthermore, although DTC contends that Graesslin was not responsible for anything beyond the call center, Graesslin has averred that she was already unofficially working on various Omni-channel initiatives.  For example, with DeOrio's knowledge, Graesslin was already: directing focus groups to improve online ordering; participating in the

selection and implementation of the new telephone system; partnering with a third-party vendor to integrate the performance management computer application with the phone system; and assisting in the management of customer Internet responses from social media. (Pl.'s PFOF (dkt. #17) ¶ 17.)   There is also evidence that Graesslin directed a planned implementation of the "Home Agent" program while at DTC, one of the very job duties that DeOrio avers Graesslin was not qualified to handle.[9]

DTC objects that Graesslin is asking the court to "sit as a super-personnel department" and review its business decisions.  *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) (quoting *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005)).  As DTC correctly points out, whether Graesslin was *actually* qualified for the new position is irrelevant, as the operative question is "not whether the employer's reasons for a decision are '*right* but whether the employer's description of its reasons is *honest*.'"  *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 678 (7th Cir. 1997) (emphasis in original) (quoting *Gustovich v. AT & T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992)).

While courts may not second-guess <u>honest</u> business decisions, however, they also "need not take an employer at its word."  *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001).  Determining "whether a belief is honest is often conflated with analysis of reasonableness."  *Flores v. Preferred Technical Grp.*, 182 F.3d 512, 516 (7th Cir. 1999).  "After all, the more objectively reasonable a belief is, the more likely it will seem that the belief was honestly held."  *Id.*; *see also Prochaska v. Menard, Inc.*, 829 F. Supp. 2d 710, 725 (W.D. Wis.

---

[9] DeOrio testified that he did not recall whether Graesslin had begun a planned implementation of a home agent program but conceded it "[c]ould have happened."  (Mark M. DeOrio Dep. (dkt. #16) 55:1-21.)  One of Graesslin's former subordinates, Faith Feldman, also avers that she worked on the home agent program under Graesslin's direction.  (Faith Feldman Aff. (dkt. #18) ¶11), and Graesslin herself has averred that she directed the planned implementation with DeOrio's knowledge (Pamela Graesslin Aff. (dkt. #22) ¶ 16(F).).

2011) (in evaluating pretext, courts may consider objective reasonableness of decision). Accordingly, if an employee "offers specific evidence from which the finder of fact may reasonably infer that the [employer's] proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses," which the court cannot resolve on summary judgment. *Gordon*, 246 F.3d at 889 (quoting *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995)).

Graesslin has met that burden here, by presenting sufficient evidence to call into question the truthfulness of DTC's explanation. A reasonable trier of fact could conclude that Graesslin was already successfully performing numerous job duties that went well beyond the mere management of Belleville Call Center employees, DTC's derogation of her responsibilities notwithstanding, given the apparent growth in Graesslin's duties and responsibilities before her illness, for the most part with the knowledge and approval of DeOrio. These facts *may* render suspect in the mind of a reasonable juror the reasonableness of DTC's articulated belief that Graesslin was simply not capable of taking on duties that extended into the realm of general customer experience, particularly since Conlin's self-assessment calls into question the importance of the "additional duties" supposedly assigned to the new Director of Customer Experience.

Finally, the "restructuring" itself is somewhat suspect on this record. Certainly, the retail world is changing, with telephonic sales necessarily playing a lesser role in light of the rise of internet commerce. On the present record before this court, however, it does not appear that DTC's so-called "restructuring" to meet that need made any practical difference, except in replacing Graesslin. "Generally, when a company reduces or restructures its work-force, it does not simply hire a new person to fill the discharged employee's old position."

*Collier*, 66 F.3d at 890.  "Rather, . . . jobs are often consolidated and/or work is shifted to other existing employees." *Id.*  In contrast, Graesslin was the *only* employee to lose her job as a result of the "restructuring."  DTC has not even presented evidence that other job responsibilities shifted between workers, much less that its general operations changed in any marked way.  On this record, a reasonable jury could find that the purported "restructuring" amounted to nothing more than an excuse to replace Graesslin with a new employee.

Graesslin also argues that the timing in this case suggests that DTC's decision was based on her cancer diagnosis.  She points out that no member of DTC's management had *ever* expressed concerns about her qualifications and capabilities until she informed DeOrio of her cancer diagnosis on June 25, 2012.  After that, Graesslin provides evidence that her "fortunes plummeted."  First, she claims that DeOrio's interactions with her diminished after she returned to work.  Second, her ongoing efforts to improve customer experience were supposedly "ignored or 'shelved.'" Third, Graesslin claims she was no longer included in important meetings.

DTC argues that some of these statements are of questionable admissibility, given their conclusory nature and the lack of any supporting facts or details. *Cf. Prochaska*, 829 F. Supp. 2d at 713 (rejecting as "vague or conclusory" various proposed findings of fact, including that plaintiff had "unparalleled" loyalty to the company, that defendant made "several comments" that were critical of plaintiff's age, and that plaintiff's leadership was "lackluster at best").  On the other hand, DTC chose to offer no concrete evidence to contradict any of her proposed findings of fact, despite being required to do so.  In the end, Graesslin provides enough circumstantial evidence in support that a trial is required to

resolve her claims.  Even without the support of any arguably conclusory "facts," Graesslin has produced specific evidence of *some* negative occurrences that followed close on the heels of her diagnosis and return to work in late October or early November of 2012.[10]   For example, she was stripped of her responsibility to make her late fall 2012/early spring 2013 presentation to DTC's Executive Team on behalf of the Contact Center.  Similarly, she was no longer invited to strategic planning/team building meetings with Senior Management, although she had attended those meetings pre-diagnosis.

Viewing the facts in the light most favorable to Graesslin, as the court must at this stage in the proceedings, DTC also began actively pursuing Conlin as a possible employee in December of 2012, less than two months after Graesslin returned to work post-surgery and still just five months since her cancer diagnosis was disclosed.  A reasonable jury could infer that this chain of events was part of a process through which DTC planned to remove Graesslin as Contact Center Manager and replace her with Conlin, a plan that DTC at least arguably set in motion soon after Graesslin recovered from surgery and returned to work.

In response, DTC argues the only timing that should matter is the yearlong gap between Graesslin's cancer diagnosis on June 25, 2012, and her termination on July 2, 2013 -- admittedly, a long delay that when viewed in isolation, would not give rise to a reasonable inference of causation.  *Cf. Tomanovich v. City of Indianapolis,* 457 F.3d 656, 665 (7th Cir. 2006) (four months between complaint and termination insufficient on its own to establish causal connection); *Kuntzman v. Wal-Mart,* 673 F. Supp. 2d 690, 716 (N.D. Ind. 2009) (ten-month    delay    does    not    indicate    suspicious    timing    "except    in    exceptional

---

[10] As noted above, she officially returned to work October 8, but she then left for a vacation with her husband.

circumstances"). But deciding when an inference of causation is reasonable based on suspicious timing "depends on context." *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011). Although Graesslin was diagnosed in June, she did not return to work until October or November of 2012, yielding a shorter delay than DTC would have the court believe. Furthermore, although her termination was still admittedly months away, a jury could reasonably infer that DTC began preparing to terminate her long before by no longer including her in planning and important meetings, taking away some of her responsibilities and beginning to look for her replacement. Considering all of the above evidence in context, a reasonable jury could find that but for Graesslin's cancer, DTC would not have terminated her.

Of course, the evidence Graesslin has presented does not *compel* this conclusion. A reasonable jury could also find that DTC's decision was honestly attributable to its concerns about needed reorganization and doubts about Graesslin's qualifications, even if those concerns and doubts were ultimately unjustified. There is, however, contemporary evidence that Graesslin was doing more as Call Center Manager than DTC now claims and that Conlin has since done less than DTC stated would be required of a Director of Customer Experience (at least as regards the so-called "Omni-channel" initiatives). Both facts suggest that DTC's articulated reasoning *could* be pretextual. The supposed "restructuring" of the company, which appears to have had no real effect except to replace Graesslin with Conlin, further supports this inference. Finally, the timing of events, while weak on its own, serves to bolster the inference of causation, including the relatively short time between Graesslin's return to work after being diagnosed with cancer and steps to limit her role in the company leading up to DTC's first attempts to recruit Conlin.

Viewing all facts in the light most reasonable to Graesslin and drawing all inferences in her favor, therefore, the court is persuaded that a jury could reasonably find that but for Graesslin's cancer, DTC would not have terminated her.   Accordingly, the motion for summary judgment will be denied.


ORDER

IT IS ORDERED that defendant Duluth Trading Company's motion for summary judgment (dkt. #10) is DENIED.

Entered this 22nd day of May, 2015.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge

22